# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| JUDY KROSHUS, et al.,<br><br>  Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>  Defendants. | 3:08-cv-0246-LDG-RAM<br>(Kroshus I) |
| ALICIA UHOUSE, et al.,<br><br>  Plaintiffs,<br><br>v.<br><br>THE UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,<br><br>  Defendants. | 3:08-cv-0285-LDG-RAM |
| BILL ADAMSON, et al.,<br><br>  Plaintiffs,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>  Defendant. | 3:08-cv-0621-LDG-RAM<br>(Adamson I) |

1

| | |
|---|---|
| LARRY J. MOORE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendants. | 3:09-cv-0167-LDG-RAM |
| JAMES ADGETT, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | 3:09-cv-0649-LDG-RAM |
| JUDY KROSHUS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, et al., <br><br> Defendants. | 3:09-cv-0713-LDG-RAM <br> (Kroshus II) |
| BILL ADAMSON, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | 3:09-cv-0715-LDG-RAM <br> (Adamson II) |
| JASON AMES, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | 3:10-cv-0463-LDG-RAM |

This matter comes before the court on the United States' motions for summary judgment regarding Flood Control Act immunity in the following cases: Adamson v. United States (Adamson I), 3:08-cv-621-LDG-RAM (#127); Moore v. United States, 3:09-cv-167-LDG-RAM (#120); Adgett v. United States, 3:09-cv-649-LDG-RAM (#74); Adamson v. United States (Adamson II), 3:09-cv-715-LDG-RAM (#78); and Ames v. United States, 3:10-cv-463-LDG-RAM (#33). The court heard oral arguments on these motions in a hearing conducted on June 13, 2011, in Reno, Nevada, and after a review of the papers and authorities, is prepared to rule.

I.

Pursuant to the Flood Control Act's immunity provision, "[n]o liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place." 33 U.S.C. § 702c. In United States v. James, 478 U.S. 597 (1986), the Supreme Court considered whether the word "damage" included personal injuries and death resulting from turbulent currents generated by releases of waters from a reservoir after the Army Corps of Engineers had determined that the waters were at "flood stage." The James Court concluded that the terms "flood or flood waters" is not narrowly confined to those waters that a federal flood control project is unable to control, and that it encompasses waters that are released for flood control purposes when reservoired waters are at flood stage. The James decision also included the following passage:

> The Act concerns flood control projects designed to carry floodwaters. It is thus clear from § 702c's plain language that the terms "flood" and "flood waters" apply to all waters contained in or carried through a federal flood control project for purposes of or related to flood control, as well as to waters that such projects cannot control.

478 U.S. at 605. The James decision, and especially the "related to" language above, soon generated conflicting opinions among courts of appeals regarding the reach of the government's immunity when flood control, even tenuously, may be connected to a project's purpose.

3

In 2001, the Supreme Court clarified whether the words "flood or flood waters" encompassed all the water that flows through a federal facility that was designed and is operated, at least in part, for flood control purposes. In Central Green Co. v. United States, 531 U.S. 425 (2001), the plaintiff alleged that the government's negligent design construction and maintenance of the Madera Canal, a part of the Central Valley Project in Central California, caused subsurface flooding resulting in damage to its pistachio orchards. In affirming the district court, the Ninth Circuit ruled that, while the Madera Canal primarily served an irrigation purpose, it was also available to divert water that might otherwise produce a flood in the San Joaquin River. Thus, according to the Ninth Circuit, immunity attached solely because it was a branch of the Central Valley Project, and therefore "'not wholly unrelated' to flood control." Central Green Co. v. United States, 177 F.2d 834, 839 (9th Cir. 1999), rev'd, 531 U.S. 425 (2001).

The Supreme Court reversed, disavowing the James' "related to" language as dicta, and observing that the Ninth Circuit's approach would support the "strange" result of attaching § 702c immunity even if the damaging water never approached flood stage and the terminus of the canal was parched at the end of the summer. 531 U.S. at 436. Instead, the Court instructed that in undertaking a flood immunity analysis, "courts should consider the character of the waters that cause the relevant damage rather than the relation between the damage and a flood control project." Id. at 437.

In its analysis, the Court in Central Green noted the difficult issue of whether the property damage "was allegedly caused by continuous or repeated flows occurring over a period of years, rather than a single, discrete incident." Id. at 436. Thus, the "damage may have occurred over a period of time in part by by flood waters and in part the routine use of the canal when it contained little more than a trickle." Id. Given that uncertainty, the Court remanded to determine whether flood or other non-flood waters caused the relevant damage.

4

II.

In its motion for summary judgment, the government emphasizes that 702c's language unambiguously extends immunity for damages resulting from "floods or flood waters," and that the January 2008 breach of the Truckee Canal and consequent inundation of plaintiffs' property must be considered a "flood" according to the plain and ordinary meaning of the statute. The government proposes that the proper immunity analysis involves inquiring first whether the event causing the damage is a "flood." If the answer is yes, immunity would attach. If the answer is no, the court would then address whether the damage was caused by "flood waters." The government argues that because the sudden collapse of the Truckee Canal precipitated a "flood," the first prong of the analysis is dispositive.[1]

The government further maintains that the circumstances of Central Green, which led the Court to find the government's immunity contingent on whether the damage was from flood waters or routine use, do not apply here: The damage in Central Green was caused by continuous flows over a period of years, and the damage claimed in this case resulted from the single, discrete incident of the breach of the Canal. Finally, the government argues exhaustively that plaintiffs have affirmatively alleged in their pleadings that their damages were the result of a "flood," which should be given the force of a judicial admission.

Plaintiffs' primary contention is that Flood Control Act immunity applies only to damage caused by flood waters at the time they were in the control of the defendant, and would not apply to non-flood waters which, after their release, cause a flood. According to plaintiffs, the water in this case should be characterized as flood or non-flood waters at the time they were in the Canal, rather than after their escape. Thus, because the waters in the Truckee Canal before the breach

---

[1] In the alternative, the government suggests the same result if the damaging waters in this case were "flood waters." However, since the government does not claim that the "flood waters" in this case were involved outside the occurrence of a "flood," it is an alternative without a difference.

5

were not flood waters, but an elevated level of irrigation water, they would not be characterized as a flood or flood waters under the statute.

The court finds both the government's and plaintiffs' positions to be off the mark. The government's position would dictate that immunity attaches to all waters of any "flood" simply by way of the resulting inundation, but only to "flood waters" to the extent they are not considered non-flood waters. The court, however, is not convinced that treating differently for immunity purposes a flood which may contain non-flood water, and flood waters which also may contain non-flood waters, is a proper approach. Since the court is unaware of authority specifically addressing that conceptual dissonance, the court looks for indications from Central Green and James, the two Supreme Court cases that have addressed the meaning of the words "flood or flood waters," for guidance in interpreting the terms "flood" or "flood waters." Indeed, while it is "appropriate to resort to the text of the statute" in construing these terms, 531 U.S. at 431, such interpretation may be "illuminated" by treatment in case law. See id.

The Court in Central Green began its analysis by identifying the two concepts of a "flood" and "flood waters" jointly, and not expressly segregating one from the other. 531 U.S. at 427. Even more illustrative is the James Court's treatment. There, the Court wrote:

> Nor do the terms "flood" and "flood waters" create any uncertainty in the context of accidents such as the ones at issue in these cases. The Act concerns flood control projects designed to carry floodwaters. It is thus clear from § 702c's plain language that the terms "flood" and "flood waters" apply to all waters contained in or carried through a federal flood control project for purposes of or related to flood control, as well as to waters that such projects cannot control. As both District Courts found, the waters here clearly fall within the ambit of the statute.

478 U.S. at 605. The Supreme Court's lack of differentiation of the concepts of a "flood" and "flood waters" suggests a contrary approach to that proposed by the government.

In addition, the Central Green Court offered the following aside regarding whether the water damage was caused by flood waters or the routine use of the canal: "The fact that a serious flood occurred in the San Joaquin in 1997 creates the distinct possibility that flood waters may have surged down the Madera Canal and harmed petitioner's property." 531 U.S. at 437. Had the Court gone the direction suggested by the government in this case, it would have given less emphasis to the origin and purpose for release of the water into the Madera Canal and more to the fact that the water once in the Canal escaped–even if over a period of time--and caused the damage.

Finally, in a case in which the district court ruled that § 702c applies to floods or flood waters in the ordinary sense of "result[ing] in whole or in part from unusual or extraordinary climatic conditions," the Ninth Circuit squarely held that the district court erred in such an application of the statute. See Peterson v. United States, 367 F.2d 271, 272, 276 (9th Cir. 1966). Peterson announced that in order for flood immunity to attach, the action which results in the damage must not be "wholly unrelated to any act of Congress authorizing expenditures of federal funds for flood control, or any act undertaken pursuant to any such authorization." Id. at 275. As explained below, that rule has been placed in question by James and Central Green; nonetheless, Peterson's rejection of immunity for any damage from any kind of flood still appears to be good law. In a case one year later, the Ninth Circuit re-affirmed that "the mere happening of a flood [does not] insulate[] the Government from all damage claims flowing from it." McClaskey v. United States, 36 F.2d 807, 808 n. 1 (9th Cir. 1967) (citing Peterson).[2]

---

[2] The government points to Stover v. United States, 204 F. Supp. 477 (N.D. Cal. 1962), aff'd, 332 F.2d 204 (9th Cir. 1964), as support for applying immunity to a "flood" in the ordinary meaning of the word. In Stover, the district court defined a flood as "water which inundates an area of the surface of the earth where it ordinarily would not be expected to be." Id. at 485. In its affirmance, however, the Ninth Circuit rejected the argument that immunity applies to natural but not to man-made floods partly for the reason that "there really would be not be any reason to legislate on damage caused purely by nature." 332 F.2d at 206. Thus, the court was not equating the breadth of the immunity statute with the lower court's definition of a flood, which would have included a natural occurrence.

7

Accordingly, based on (1) the incongruity between a "flood" and "flood waters" under the analysis offered by the government, (2) the lack of authority segregating the concepts of a "flood" and "flood waters" in the way urged by the government, and (3) Peterson's rejection of immunity for "flooding" in the ordinary sense of the word, the court declines to adopt the government's approach.  Furthermore, the court's decision in this regard makes it unnecessary to address whether plaintiffs are bound by judicial admission of those terms.

The court is also unpersuaded of the correctness of plaintiffs' position that flood immunity applies only to damage caused by naturally caused "flood waters" at the time they were in control of the government.  While a defendant's control of the waters may be a constituent of their character and the purposes behind their release, that element has not been treated as conclusive of immunity by the courts.  For instance, in Central Green, the Supreme Court remanded on the difficult question of what proportion of damage was caused by flood as opposed to non-flood waters, not on the presumably easier question of whether the waters were under the government's control in the Madera Canal before they caused the subsurface water damage.  In addition, in order to illustrate when a release is or is not "flood water," the Central Green Court juxtaposed James and Henderson v. United States, 965 F.2d 1488 (8th Cir. 1992).  In James, the water was "flood water" because the Army Corps of Engineers had determined the waters were at flood stage before releasing them.  But in Henderson, the Eighth Circuit determined that the water was not "flood water" since the release was directed by the power company for the commercial purpose of generating electricity.  Central Green, however, did not find it significant that, in Henderson, the Corps of Engineers controlled the water before releasing it at the direction of the power company. Nor does this court find the control aspect to be determinative of whether immunity attaches.

### III.

Flood immunity precedent has been left unsettled, to say the least, by Central Green. Conspicuously, the James-derived "related to" standard no longer governs.  While the Central

Green Court did not specifically adopt any of the competing court-of-appeals tests for determining the applicability of § 702 flood immunity, it did instruct courts to "consider the character of the waters that cause the relevant damage [and the purposes behind their release] rather than the relation between the damage and a flood control project." 531 U.S. at 434, 436. The degree to which this position undermines the Ninth Circuit's immunity-yielding stance on whether "the events giving rise to the action were not wholly unrelated to the project," see Washington v. East Columbia Basin Irrigation Dist., 105 F.3d 517, 520 (9th Cir. 1997), has not been addressed by the Circuit. However, a reappraisal of Ninth Circuit case law in the context of Central Green provides some guidance to the court.

Prior to Central Green, the issue of whether the purpose for which water held in a flood control project could impact the grant of immunity divided the courts of appeal. Several circuits looked to the purposes for holding and releasing of the water in applying immunity. See Hayes v. United States, 585 F.2d 701, 702-03 (4th Cir. 1978) ("If the plaintiff could prove damage to his farm as a result of the dam's operation as a recreational facility without relation to the operation of the dam as a flood control project, he would avoid the absolute bar of § 702c."); Bailey v. United States, 35 F.3d 1118, 1124 (7th Cir. 1994); (remanding for a hearing to determine whether injuries resulted from flood control activities); Holt v. United States, 46 F.3d 1000, 1004-05 (10th Cir. 1995) (adopting a two-part test requiring a nexus between flood control activity and the plaintiff's injury).

Other circuits held that it was the congressional authorization of the project as one for flood control, and not the actual purpose for which the project was being operated, in determining whether § 702c conferred immunity. See Reese v. South Florida Water Management Dist., 59 F.3d 1128, 1130-31 (11th Cir. 1995) (any water held in a flood control project is "flood water" regardless of the purpose for which the water is being used); Boudreau v. United States, 53 F.3d 81, 85-86 (5th Cir. 1995) (extending immunity to preclude claims for damages arising out of

9

activities such as recreational management); Fisher v. United States Army Corps of Engineers, 31 F.3d 683, 684-85 (8th Cir. 1994) (flood control immunity applies when government flood control activities are a substantial cause in the injury); Dawson v. United States, 894 F.2d 70, 73-74 (3rd Cir. 1990) (not wholly unrelated to congressionally authorized flood control project).

For its part, Ninth Circuit case law joined the latter group of courts in applying § 702c immunity based on whether Congress authorized the project as being for flood control. See Peterson, 367 F.2d at 275 (immunity did not protect the government's actions because "[t]he decision to dynamite the ice jam was wholly unrelated to any act of Congress authorizing expenditures of federal funds for flood control, or any act undertaken pursuant to any such authorization"); McClasky v. United States, 386 F.2d at 808 (while not mentioning congressional authorization for the project, the court relied on the connection between the construction of the railroad crossing and its indirect relationship to flood control purposes); Aetna Ins. Co. v. United States, 628 F.2d 1201, 1204 (9th Cir. 1980) (flood control was "very much on the minds of the members of Congress in passing [Teton Basin Project] legislation"); United States v. Pierce, 650 F.2d 202, 204-205 (9th Cir. 1981) (immunity for damage from impoundment floodwaters resulting in damaging backwaters related to congressionally authorized purpose of flood control); Morici Corp. v. United States, 681 F.2d 645, 648 (9th Cir. 1982) (it is not the purpose of the specific release, but rather the congressionally authorized purpose of the project which conferred immunity); McCarthy v. United States, 850 F.2d 558, 561-62 (9th Cir. 1988) (post-James; the water in the lake was "flood water" with a nexus to a federal flood control project; although the lake was being used primarily for recreational purposes at the time of the injury, the lake was behind a dam constructed as part of a congressionally authorized flood control project); Washington v. East Columbia Basin Irrigation Dist.,105 F.3d 517, 519-20 (9th Cir.), cert. denied, 522 U.S. 948 (1997) (post-James; § 702c immunity for burst of irrigation canal retaining walls

because canal was part of Columbia Basin Project that had flood control as one of its congressionally authorized purposes).

Each of these Ninth Circuit pre-Central Green cases followed a pattern of granting § 702c immunity based on whether the project involved flood control as a congressionally authorized purpose, or was related to a flood control purpose. None of the cases granting immunity turned on an interpretation of the waters as a flood; and the one case that denied immunity, Peterson, did so in part based on a rejection of the notion that immunity extends to floods in the ordinary sense that result from bad weather.

After the Ninth Circuit's decision in Central Green, the Supreme Court got into the act, reversing Central Green by rejecting the broad application of immunity if the flood or flood waters are simply related, directly or indirectly, to a flood control project. But it is the Central Green Court's refocus on the character of the waters and the purpose for their release in the immunity analysis that is instructive to the case at hand. In Central Green, the Supreme Court clearly identified waters released at the direction of a private enterprise for a commercial purpose as not constituting flood waters. 531 U.S. at 436.

In the end, the court is informed as much by what Central Green left in place, as by what it removed. The Central Green Court did not reject a nexus between immunity and a congressionally authorized purpose of flood control. Rather, it redirected the inquiry from whether a flood control project was related to the cause of the damage, to whether the damaging water was related to flood control. And in that respect, it would make a difference whether the damage was caused by flood or non-flood water, or whether the water was released for a purpose related to flood control.

IV.

In this case, the government has not raised an issue of fact that the waters in the Truckee Canal prior to the breach were at flood level, or that overtopping of the Canal was a cause of the

breach. According to engineering reports in the record, the water level at the breach location did not exceed 4,193 feet above sea level, which is over three feet below the Canal embankment crest. In addition, those reports indicate that snow was observed on the waterside slope of the embankment some distance below the crest elevation immediately after the failure, which snow would have been melted to the crest level had the embankment overtopped. Nor does the record indicate that any flooding occurred in the area caused by precipitation before the breach.

The government has not raised an issue of fact that the water in the Truckee Canal immediately prior to the breach had been released for any purpose other than as a deliberate diversion from the Truckee River to increase the supply of irrigation water, or that any of the water diverted into the Canal was flood water. At a minimum, pursuant to the teaching of Central Green, a genuine issue of material fact exists regarding whether the Canal had exceeded its ordinary capacity at the time of the bank failure or, even assuming the Truckee River was carrying flood waters that were diverted into the Canal, what proportion of such water contributed to the damage.

V.

Based on the above conclusions, the court finds that the government is not entitled to summary judgment based on § 702c immunity. Accordingly,

THE COURT HEREBY ORDERS that the United States' motions for summary judgment regarding Flood Control Act immunity in Adamson v. United States (Adamson I), 3:08-cv-621-LDG-RAM (#127); Moore v. United States, 3:09-cv-167-LDG-RAM (#120); Adgett v. United States, 3:09-cv-649-LDG-RAM (#74); Adamson v. United States (Adamson II), 3:09-cv-715-LDG-RAM (#78); and Ames v. United States, 3:10-cv-463-LDG-RAM (#33) are DENIED.

DATED this ____ day of September, 2011.

_____
Lloyd D. George
United States District Judge

12